IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHARLES ALLEN, JR.,
      Petitioner,

v.                           Case No.  5:09cv287/MCR/CJK

KENNETH S. TUCKER,
      Respondent.

_____

## REPORT AND RECOMMENDATION

      Before the Court is an amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 30).  Respondent filed an answer (doc. 46), submitting relevant portions of the state court record (docs. 14, 50).  Petitioner replied.  (Doc. 52).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of the issues petitioner raises, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the Court show that petitioner is not entitled to federal habeas relief, and that the amended petition should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

      On May 8, 2008, petitioner was charged in the Circuit Court for Bay County,

Florida, with robbing three banks.  (Doc. 14, Ex. A, Docket Sheets and Ex. A, p. 7, Ex. B, pp. 64, 117).  The robberies were charged in three separate cases – Case Numbers 08-1168, 08-1169 and 08-1170.  (*Id.*).  On October 23, 2008, petitioner filed a motion in all three cases seeking to suppress evidence obtained through an allegedly illegal search of petitioner, his vehicle and immediate vicinity.  (Doc. 14, Ex. A, pp. 17-25).  The motion was denied after a hearing.  (Doc. 14, Ex. D).  Petitioner went to trial on one of the robberies – the robbery charged in Case Number 08-1170.  (Doc. 14, Exs. C, D, F).  Prior to trial the State moved to have petitioner determined a Habitual Violent Felony Offender ("HVFO") and a Prison Releasee Reoffender ("PRR").  (Doc. 14, Ex. B, pp. 145-46, 174-75).  On October 30, 2008, a jury convicted petitioner as charged in Case Number 08-1170.  (Doc. 14, Ex. B, p. 87).  The court determined petitioner was an HVFO and PRR, and sentenced petitioner on October 30, 2008 to 30 years imprisonment as an HVFO, with the first 15 years to be served as a PRR.  (Doc. 14, Ex. F, pp. 169-75).  Petitioner's Case Numbers 08-1168 and 08-1169 were set for a pretrial conference on November 5, 2008.  (*Id.*).

On November 5, 2008, petitioner executed a written Plea, Waiver and Consent form ("Plea Agreement") in which he pleaded no contest to the robberies in Case Numbers 08-1168 and 08-1169.  (Doc. 14, Ex. A, pp. 34-35).  The Plea Agreement provided that petitioner would be sentenced to 30 years imprisonment on each count as an HVFO, that the first 15 years of each sentence would be served as a PRR, and that the sentences would run concurrent with each another and with petitioner's existing sentence in Case Number 08-1170.  (Doc. 14, Ex. A, p. 34; Ex. E, p. 357).  The Plea Agreement further provided that petitioner waived notice and a hearing on his sentencing as an HVFO and PRR; that no probation would follow petitioner's

sentences; that petitioner reserved the right to appeal the denial of his motion to suppress, and if the appeal on that issue was successful petitioner could withdraw his no contest pleas and the State could re-file Case Number 08-1168 as an armed robbery. (*Id*.). The trial court accepted petitioner's pleas on November 5, 2008, adjudicated petitioner guilty of the robberies in Case Numbers 08-1168 and 08-1169, determined petitioner to be a PRR and HVFO, and sentenced petitioner in accordance with the Plea Agreement. (Doc. 14, Ex. A, pp. 32-33, 41-53, 56-57; Ex. B, pp. 88-89 and 109-110; Ex. E, pp. 359-65). On November 12, 2008, the trial court entered an order that as an HVFO, petitioner was not eligible for release for 10 years. (Doc. 14, Ex. A, pp. 56-57; Ex. B, pp. 109-110).

Petitioner's three cases were consolidated for purposes of direct appeal. Petitioner's direct appeal raised one issue – that the trial judge erred in denying petitioner's motion to suppress. (Doc. 14, Ex. G). On June 25, 2009, the Florida First District Court of Appeal ("First DCA") per curiam affirmed without written opinion. *Allen v. State*, 11 So.3d 943 (Fla. 1st DCA 2009) (Table) (copy at Doc. 14, Ex. H).

On February 1, 2010, petitioner filed a motion to correct sentence under Florida Rule of Criminal Procedure 3.800(a). (Doc. 50, Ex. J, pp. 1-12). The motion was denied on March 8, 2010. (*Id*., pp. 13-19). Petitioner appealed. (*Id*., pp. 20-21). The First DCA assigned Case Number 1D10-1764, and per curiam affirmed. (Doc. 50, Ex. K; *see also Allen v. State*, No. 1D10-1764, 41 So.3d 891 (Fla. 1st DCA 2010) (Table)). The mandate issued August 31, 2010. (*Id.*).

On May 6, 2010, petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he later amended. (Doc. 50, Ex. L, pp. 111-173). The motion was denied by orders rendered September 8, 2010 and May

4, 2011.  (Doc. 50, Ex. M, pp. 177-473 and 741-904).  Petitioner appealed.  The First DCA assigned Case Number 1D11-2528, and per curiam affirmed on September 7, 2011.  *Allen v. State*, 72 So.3d 748 (Fla. 1st DCA 2011) (Table).  Petitioner's motion for rehearing was denied on October 26, 2011.  (*Id*.).

On May 25, 2011, petitioner filed a second motion to correct sentence under Florida Rule of Criminal Procedure 3.800(a), claiming that he was improperly sentenced as both a PRR and HVFO.  (Doc. 50, Ex. Q, pp. 1-13).  The trial court denied relief on June 14, 2011.  (*Id.* pp. 14-30).  Petitioner appealed.  (*Id*., p. 31).  The First DCA assigned Case Number 1D11-3683.  (Doc. 50, Ex. R).  The First DCA per curiam affirmed on November 9, 2011.  *Allen v. State*, 77 So.3d 183 (Fla. 1st DCA 2011) (Table).  Petitioner's motion for rehearing was denied on January 10, 2012.  (*Id*.).

Petitioner filed his original federal habeas petition in this Court on August 14, 2009.  (Doc. 1).  Petitioner's amended petition, filed on October 19, 2011, raises fourteen grounds for relief:  (1) trial counsel was ineffective for failing to subpoena Mark Davey to testify at the suppression hearing; (2) trial counsel was ineffective for failing to subpoena Ms. Caleia to testify at the suppression hearing; (3) trial counsel was ineffective for failing to subpoena Paul Johannis to testify at the suppression hearing; (4) trial counsel was ineffective for failing to subpoena D'Wayne Johnson to testify at the suppression hearing; (5) trial counsel was ineffective for failing to subpoena Kevin Cheek to testify at the suppression hearing; (6) trial counsel was ineffective for failing to move to suppress the photo lineup as impermissibly suggestive; (7) trial counsel was ineffective for failing to object to the trial court's decision not to answer particular jury questions; (8) trial counsel was ineffective for

failing to strike Juror James Burke on the grounds that Burke was aware of petitioner's criminal history and tainted the jury with that information; (9) trial counsel was ineffective for failing to object to the racial composition of the jury; (10) the cumulative effect of trial counsel's errors identified in Grounds 1-9 deprived petitioner of his Sixth Amendment right to counsel and Fourteenth Amendment right to due process; (11) petitioner was subjected to an illegal search and seizure, and the trial court improperly denied his motion to suppress; (12) mistaken identity and perjury; (13)  witness perjury where the State gave Michael Allen $300 to identify petitioner and testify that he was petitioner's brother; and (14) C.S.I Vickers planted false evidence (money bands) on petitioner's personal money.  (Doc. 30, continuation pages 1-17).

## STANDARD OF REVIEW

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19. Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]   The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *Thaler v. Haynes*, — U.S. —, 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608

---

[1]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

F.3d 1313, 1315 (11th Cir. 2010).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the state court decision is not contrary to clearly established federal law, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but

unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court, however, may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009).

When faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir. 2011) (*citing Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011)).  The federal court  must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision. *See Richter*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).  In sum, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Richter*, 131 S. Ct. at 786-87.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill*, 633 F.3d at 1292.

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1).  The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011).  However, the Eleventh Circuit recently declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court

decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. 930, 954, 127 S. Ct. 2842. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 131 S. Ct. at 786.

Within this framework, the Court will review petitioner's claims.

BACKGROUND OF PETITIONER'S MOTION TO SUPPRESS

Six of petitioner's claims involve petitioner's motion to suppress physical evidence seized upon execution of a search warrant on April 9, 2008. (*See* Doc. 30, Grounds 1-5 and 11). The following facts are drawn from the record.

Petitioner's motion to suppress challenged a warrant authorizing the search of a house located at 909 Kraft Avenue, and a red car situated directly in front of the house. (Doc. 14, Ex. A, pp. 17-25). The warrant application/affidavit was prepared by D'Wayne Johnson, an investigator with the Bay County Sheriff's Office. Johnson's affidavit stated, in relevant part:

(1) On March 18, 2008, Regions Bank located on Tyndall Parkway was robbed by a black male with a dark colored mustache and beard wearing dark clothing and a dark colored toboggan;

(2) On April 2, 2008, Bay Bank located on Panama City Beach Parkway was robbed by a black male with a dark colored mustache and beard wearing dark clothing and a dark colored toboggan.  Crime scene investigators located a footwear impression left by the black male and identified the impression as being made by a Nike Air Force One athletic shoe;

(3) On April 8, 2008, Prosperity Bank located on Tyndall Parkway was robbed by a black male with a dark colored mustache and beard wearing dark clothing and a dark colored toboggan;

(4) Based on bank surveillance videos and photographs, law investigators believed the same black male robbed all three banks;

(5) Law enforcement distributed still photographs of the robber (produced from the bank surveillance videos) to the media and other law enforcement;

(6) On April 8, 2008, Michael Allen called the Bay County Sheriff's Office and stated that he saw a photograph of the offender and believed it was his brother Charles Allen.  Sheriff's Office investigators traveled to Apalachicola, Florida, met with Michael Allen and showed Allen surveillance photos from the Prosperity Bank robbery.  Michael Allen stated that the individual in the photo was "definitely" his brother Charles.  Michael Allen provided a sworn statement to that effect;

(7) Law enforcement's research revealed that Charles Allen Jr. was released from the Department of Corrections in 2007 for bank robbery; that Charles Allen's address was a Georgia address; and that Charles Allen had relatives in Panama City, and Apalachicola, Florida;

(8) Witnesses outside of Prosperity Bank identified a possible suspect vehicle, which was described as a red Chevy passenger car, possibly a Chevy Cavalier or a

Chevy Corsica, with white along the front of the vehicle.  The vehicle was operated by a black male, possibly having dreadlocks;

(9) On April 8 , 2008, a Sheriff's Office investigator located what was possibly the suspect vehicle at 909 Kraft Avenue.  The vehicle was a red Chevy Cavalier, 2 door, with a white piece bearing a Chevy emblem on the front.  The vehicle bore a Georgia temporary tag.  A computer search of the Vehicle Identification Number revealed that the vehicle registration was cancelled by Reginald Parker.  Footwear impressions were located at the vehicle.  The footwear impressions led to the house at 909 Kraft Avenue.  The footwear impressions were consistent with the Nike Air Force One footwear impression from the Bay Bank robbery;

(10)  An unidentified neighbor near 909 Kraft Avenue stated that she observed two individuals working on the red vehicle – one had dreadlocks and the other had a mustache and beard;

(11) Charles Allen Jr.'s probation officer stated that Charles Allen had listed, with probation and parole, 909 Kraft Avenue as his residence of record; and

(12) Charles Allen Jr., was currently on probation and listed 909 Kraft Avenue as his address.

(Doc. 14, Ex. A, pp. 23-24).  Based on the foregoing facts, Investigator Johnson stated that he believed Charles Allen Jr. resided at 909 Kraft Avenue, and that evidence in the robberies would be located in the residence at 909 Kraft Avenue or any vehicle located on that property.  (*Id*., p. 24).  The search warrant was issued on April 9, 2008, and executed the same day.  Police seized physical evidence from the car, from petitioner's person, and from a bag petitioner dropped in the carport attached to 909 Kraft Avenue.  (*Id*., p. 19).  No evidence was seized from the

Case 5:09-cv-00287-MCR-CJK   Document 53   Filed 06/08/12   Page 13 of 56

Page 13 of 56

residence.  (Doc. 14, Ex. D, p. 352).

The defense argued that the search warrant was unconstitutional, because it was based on a flawed affidavit which did not establish probable cause to search the red car.  The alleged flaws in Investigator Johnson's affidavit were:  (1) the affidavit stated that "Charles Allen Jr.'s probation officer stated that Charles Allen listed, with probation and parole, 909 Kraft Avenue as his residence of record" (*id*., p. 24), but petitioner's federal probation officer denied ever identifying 909 Kraft Avenue as petitioner's address; (2) the affidavit stated that "Charles Allen Jr. is currently on probation and has listed 909 Kraft Avenue as his current address" (*id*.), but petitioner's federal probation officer stated that the address petitioner listed with probation was an apartment on Transmitter Road; and (3) the affidavit stated that "witnesses" believed they saw a red Chevy car with white on the front leave the scene of the robbery (*id*.), but there was only one witness – Mr. Cheek – and when police took Mr. Cheek to 909 Kraft Avenue to examine and identify the red car, Mr. Cheek said the car was not the one he saw leaving the bank.  Investigator Johnson's warrant affidavit said nothing about Mr. Cheek's examination of the car at 909 Kraft Avenue. Defense counsel argued that disregarding the flawed information, the remaining information in the affidavit was insufficient to establish probable cause to search the residence or the red car.  Counsel further argued that had the omitted information been included (Mr. Cheek's statement that the red car at Kraft Avenue was not the one he saw leaving the bank) the judge would have found there was not probable cause to issue the warrant.  (Doc. 14, Ex. D, pp. 339-40)

The trial court held a suppression hearing on October 27, 2008.  (Doc. 14, Ex. D).  Two witnesses testified:  Captain Jimmy Stanford with the Bay County Sheriff's

Case No: 5:09cv287/MCR/CJK

Office ("BCSO) and BCSO Deputy Chad King.

Captain Stanford testified to the following facts.  Stanford was involved in investigating the robbery of Prosperity Bank on April 8, 2008.  (Doc. 14, Ex. D, p. 306).  The bank provided Stanford with surveillance videos of the robbery.  (*Id*.).  Still photographs of the robber were produced from the surveillance videos.  (*Id*.).  Stanford distributed the still photographs to law enforcement and the media.  (*Id*.).  Petitioner's brother, Michael Allen, called the BCSO and told them that he recognized his brother as the bank robber in the photo.  (*Id*., pp. 306-07).  Michael Allen's telephone call prompted law enforcement to do a background investigation of petitioner, which included contacting the FBI agent for the area, Matt Melia.  (*Id*., p. 307).  At approximately 8:40 p.m. on the night of April 8, 2008, Mr. Melia sent e-mails to Stanford which included an updated picture of petitioner and information regarding some of petitioner's family members.  (*Id*., p. 308).  One of the listed family members was Brandy Austin, petitioner's granddaughter.  (*Id*., pp. 308-09).  Law enforcement searched its reporting system in the Sheriff's Office and found a November 28, 2007 incident report listing Brandy Austin's home address as 909 Kraft Avenue.  (*Id*., p. 309).

Law enforcement had been looking at the Kraft Avenue address earlier in the day because of a vehicle that was seen in the driveway.  (*Id*., p. 309).  A witness (Mr. Cheek) who was outside the bank at the time of the robbery said that he saw a suspicious black male run from the bank, get into a vehicle (a red Citation, later corrected to be a Cavalier) and speed away from the area.  Law enforcement believed the red car to be the getaway car.  A BOLO was issued for the vehicle matching Mr. Cheek's description (a red car with some white on the front bumper).  At

approximately 1:30 or 2:00 p.m., a deputy found a vehicle matching that description parked at 909 Kraft Avenue.  (*Id*., p. 310).  At approximately 2:30 or 3:00 p.m, law enforcement took Mr. Cheek to the Kraft Avenue address to see if he could identify the car.  Mr. Cheek said he did not think it was the car.  (*Id*., p. 311).   Law enforcement backed off of the 909 Kraft Avenue address.  (*Id*., p. 312).   Law enforcement's receipt of Mr. Melia's e-mails later that day indicating that petitioner's granddaughter lived at 909 Kraft Avenue rekindled law enforcement's interest in that address.  Law enforcement officers were sent back to 909 Kraft Avenue while other officers applied for a search warrant.  (*Id*., p. 313).

Stanford testified that the Prosperity Bank robbery was the third robbery law enforcement attributed to the same person.  (*Id*., p. 307).  Shoe tracks leading from the red car at 909 Kraft Avenue were consistent with shoe prints seen at one of the previous robberies connected to the Prosperity Bank robbery.  (*Id*., p. 314).

Stanford did not prepare the search warrant application.  The  application was prepared by Investigator D'Wayne Johnson.  (*Id*., p. 315).  Johnson's statement that Kraft Avenue was the address petitioner listed with his federal probation officer was based on information received from Nicki Vickers, a crime scene technician, who received the information from Chad King, who received the information from "P.J." with the United States Marshals Service, who had spoken to someone at parole and probation.  (*Id*., p. 316).

Stanford testified on cross-examination that Johnson's affidavit did not include the information about petitioner's granddaughter living at 909 Kraft Avenue, because the information from the federal parole and probation office provided more substantial evidence.  (*Id*., p. 319).  Stanford was unaware that Johnson's affidavit

omitted the fact that Mr. Cheek denied the red car at 909 Kraft Avenue was the suspect vehicle. The State Attorney's Office had instructed law enforcement to include that fact. (*Id.*, pp. 315, 317-18).

Deputy Chad King testified that he was part of the unit that was sent to watch the 909 Kraft Avenue address. (Doc. 14, Ex. D, p. 322). While King was watching the address, he called his contact at the United States Marshals Service, Paul Johannis, because King had heard petitioner was on federal probation. (*Id.*). Deputy King asked Johannis if Johannis could find any information about petitioner. Mr. Johannis called King back after talking to someone in the probation department and reported that petitioner's listed address with probation was 909 Kraft Avenue. (*Id.*, p. 323). King passed that information on to Nicki Vickers, his contact point with "CID." (*Id.*, p. 324).

The parties stipulated to the admission of two e-mails from petitioner's federal probation officer Mark Davey. Mr. Davey's e-mails were admitted in lieu of Mr. Davey's live testimony. (Doc. 14, Ex. D, pp. 304-05). Mr. Davey's first e-mail, dated October 21, 2008, states in relevant part:

> I have looked through my file but see no mention of any other address in P.C. [Panama City] besides the Transmitter Rd residence with [Charles Allen's] niece, Brandi Austin. On the evening of April 8, 2008, I received a call from USPO Francine Ware who told me a guy named P.J. with the S.O. wanted to talk to me about the subject's whereabouts. From my home, I called P.J. at about 11:30 pm, but didn't have the offender's file or info with me. Told him that Allen resided with Brandi Austin in P.C., but I couldn't recall the address without looking at the file the next morning. Told him subject had been in Atlanta but was denied transfer there. Told him the subject was given the option to move to P.C. with relatives or West Palm Beach. When I told P.J. about subject's residence with his niece, it sounded like he may have been

familiar with it.  I have no info at all as to the Kraft Avenue address, where Allen was arrested.  The morning after subject's arrest, I called for Investigator Vickers of the S.O. who had left a message on my voicemail at the office.  I was going to give him the Transmitter Rd. address that I listed, but was advised by him that the subject was already in custody.  I then spoke to Matt Melia with the FBI for the first and only time on 4/11/08 and faxed him prior record documents.

As to his most recent conviction/release, Allen was sentenced on 7/18/91 to 230 months Prison followed by 3 years supervised released [sic] based upon his conviction for the offense of Bank Robbery, in Southern District of Florida case 90-8063-CR-ROETTGER.  Allen was released from prison to begin his term of supervised release on 5/18/07 to the Northern District of Florida. . . .

(Doc. 30, Ex. D, p. 1).  Mr. Davey's second e-mail, dated October 23, 2008, states:

On 4/9/08, I was contacted late in the evening at my home by USPO Francine Ware advising that a US Marshal, who goes by P.J., wanted to talk to me about Charles Allen's possible involvement in local bank robberies.  I called P.J. and advised him that Allen did, in fact, reside in Panama City with his niece Brandi.  I could not recall the address or Brandi's last name, but told P.J. that Allen had been given permission to reside with Brandi previously by me.  I told P.J. that I would call him first thing in the morning when I had benefit of the file to give him the exact address.

In our conversation, I also told P.J. about Allen's relatives in Apalachicola and that Allen had recently resided with Brandi in Apalachicola before moving to Atlanta.

(*Id*., p. 2).

The trial court denied petitioner's motion to suppress.  (Doc. 14, Ex. D, pp. 348-51).  The trial court found that the Sheriff's Department acted in good faith and did not act in bad faith to intentionally mislead the judge who signed the warrant.  (*Id*., p. )  The trial court noted that the information about petitioner's residence would

have been discovered inevitably. The trial court further found that disregarding the flawed information about petitioner's residence, and considering the information about Mr. Cheek denying the identity of the red car at Kraft Avenue, there was sufficient evidence tying petitioner to the car: the description of the car (which was distinctive – a red Chevy with white on the front), the Georgia tag, the footprints and the description of petitioner's hair at the time of the robbery. (*Id.*, pp. 348-51).

## DISCUSSION

<u>Ground 1</u>    <u>Trial counsel was ineffective for failing to subpoena Mark Davey to testify at the suppression hearing</u>

Petitioner faults trial counsel for failing to call Mark Davey to testify at the suppression hearing. Petitioner asserts that Mr. Davey would have testified that petitioner did not live at 909 Kraft Avenue, that petitioner's address was 499 Transmitter Rd., and that at no time did Davey tell anyone that petitioner lived at 909 Kraft Avenue. (Doc. 30, continuation page 1). Petitioner argues that as a result of defense counsel not calling Mr. Davey, the State's assertion that Mr. Davey told Marshal Paul Johannis that petitioner lived at 909 Kraft Avenue went "unrebutted" at the suppression hearing. (*Id.*). Petitioner argues that had Mr. Davey testified at the suppression hearing, the motion to suppress would have been granted. (*Id.*). The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding. (Doc. 46, p. 19).

A.    Clearly Established Federal Law

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S. Ct. 1441, 1449 n. 14, 25 L. Ed. 2d 763 (1970) (recognizing that "the right to counsel is the right to the effective assistance of counsel."); *Strickland v. Washington*, 466 U.S.

668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674 (1984).  Ineffective assistance claims are governed by the United States Supreme Court's opinion in *Strickland v. Washington, supra*.  *Strickland* held that a successful claim of ineffective assistance requires a defendant to show both deficient performance by counsel and prejudice resulting from that deficiency  *Id*. at 687, 104 S. Ct. 2052.

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*citing Strickland*). Reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314. Courts must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *see also e.g., Chandler* at 1314 (explaining that the *Strickland* standard compels courts to "avoid second-guessing counsel's performance").

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067.  The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*., at 694, 104 S. Ct. at 2068. Bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The petitioner must support his allegations of prejudice with evidence.

B.     Federal Review of State Court Decision

The Rule 3.850 court denied relief on this claim after identifying *Strickland* as

the controlling legal standard.  (Doc. 50, Ex. M, p. 177).  The court ruled:

> [T]he record reflects that the Court was aware of this information when it ruled on the motion to suppress.  Trial counsel introduced e-mails into evidence form Mr. Davey containing substantially the same information that Defendant alleges Mr. Davey could have testified to.  Moreover, the State conceded to these facts.   Accordingly, Defendant was not prejudiced by the fact that Mr. Davey did not testify and counsel was not ineffective for not subpoenaing him.

(Doc. 50, Ex. M, p. 178) (citations to record omitted).  The state appellate court summarily affirmed.

As the Rule 3.850 court found, the record establishes that defense counsel presented, and the state trial court considered, the same facts to which petitioner says Mr. Davey would have testified had Davey been subpoenaed.  Counsel simply presented Davey's statements in a different form.  Petitioner has not shown that presenting Davey's testimony in paper form (through Davey's e-mails) versus live was objectively unreasonable, or that there is a reasonable probability the result of the suppression hearing would have been different had Mr. Davey testified live.  The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 2</u>     <u>Trial counsel was ineffective for failing to subpoena Ms. Caleia, the owner of the house at 909 Kraft Avenue, to testify at the suppression hearing</u>

Petitioner faults trial counsel for failing to call Ms. Caleia to testify at the suppression hearing.  Petitioner asserts that Ms. Caleia would have testified that petitioner never lived at 909 Kraft Avenue and that petitioner was only there visiting.  (Doc. 30, continuation page 2).  Petitioner argues that Ms. Caleia's testimony would

have proved that petitioner did not live at 909 Kraft Avenue.  (*Id*.).  Petitioner argues that had Ms. Caleia testified, the motion to suppress would have been granted.  (*Id*.). The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, p. 19).

      A.     Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

      B.     Federal Review of State Court Decision

The Rule 3.850 court denied relief, explaining:  "As noted in response to Ground One, the Court was aware of this information at the time it ruled on the Motion to Suppress.  There is no reasonable probability that 'Ms. Caleia's' testimony concerning information that the Court was already aware of would have changed the outcome of the suppression hearing.  Thus, counsel was not ineffective for failing to subpoena 'Ms. Caleia.'"  (Doc. 50, Ex. M, p. 178).  The state appellate court summarily affirmed.

The search warrant affidavit identified petitioner's address as 909 Kraft Avenue and identified the source of that information as petitioner's federal probation officer.   Defense counsel presented evidence at the suppression hearing that petitioner's federal probation officer never identified 909 Kraft Avenue as petitioner's address, and that petitioner's actual address was 499 Transmitter Rd. Any additional testimony from Ms. Caleia that petitioner did not live at 909 Kraft Avenue would have been cumulative.  Defense counsel was not ineffective for failing to present evidence that was merely cumulative.  *See Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006) (holding that habeas petitioner could not demonstrate

that the state courts' determination that he failed to prove prejudice under *Strickland* was objectively unreasonable, where petitioner's proposed new evidence was merely cumulative and elaborated on other evidence that counsel presented); *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n. 7 (11th Cir. 2002) (noting that, "[a] petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative."); *Glock v. Moore*, 195 F.3d 625, 636 (11th Cir. 1999) (holding that habeas petitioner failed to show prejudice under *Strickland*, "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented . . .").

The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 3</u>   <u>Trial counsel was ineffective for failing to subpoena Paul Johannis to testify at the suppression hearing</u>

Petitioner faults trial counsel for failing to subpoena Deputy U.S. Marshal Paul Johannis to testify at the suppression hearing.  Petitioner asserts that Deputy Johannis would have testified that "the address 909 Kraft Ave was a mistake he made."  (Doc. 30, continuation page 3).  Petitioner argues that Deputy Johannis' testimony would have proved petitioner never lived at 909 Kraft Avenue.  (*Id*.).  The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, p. 19).

A.   Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.   Federal Review of State Court Decision

The Rule 3.850 court denied relief, explaining:  "As stated previously, the Court was already aware of this information and there is no reasonable probability that U.S. Marshal Johansson's testimony would have changed the outcome of the suppression hearing."  (Doc. 50, Ex. M, p. 178) (citations to record omitted).  The state appellate court summarily affirmed.

This ground for relief should be denied for the same reason as Ground 2 was denied.  The testimony petitioner's proposes – that Johannis "made a mistake" when he reported that Davey said petitioner resided at 909 Kraft Avenue –  would have been cumulative, because Mr. Davey's e-mails already established that fact.  The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 4</u>     <u>Trial counsel was ineffective for failing to subpoena Mr. D'Wayne Johnson to testify at the suppression hearing</u>

Petitioner faults trial counsel for failing to subpoena Bay County Sheriff's Office Investigator D'Wayne Johnson to testify at the suppression hearing. Investigator Johnson was the author of the search warrant affidavit.  Petitioner asserts Investigator Johnson would have testified to the following:  (1) that Johnson "got the false information from Mr. Paul Johannis, U.S. Marshall [sic] to where petitioner lived"; (2) that "Mr. Davey '<u>never</u>' gave Mr. Johannis 909 Kraft ave. address"; (3) that "Mr. Davey gave Mr. Johannis 499 Transmitter Rd. apt. address"; (4) that there was only one witness (Mr. Cheek) who saw the car leaving the bank, that Mr. Cheek was taken to 909 Kraft Avenue to identify the red car, and Mr. Cheek said the car at 909 Kraft Avenue was not the one he saw leaving the bank; (5) that State Attorney Bill Lewis told Investigator Johnson to include the information about Cheek's

affirmative denial of the car's identity; (6) that Johnson knowingly and intentionally omitted the information about Cheek's denial; and (7) that Johnson falsely stated that there was more than one witness to the suspect vehicle, when Johnson  knew there was only one witness Mr. Cheek.  (Doc. 30, continuation pages 4-5).  Petitioner argues that had Investigator Johnson testified, the trial court would have granted the motion to suppress.  (*Id*.).  The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, p. 19).

     A.    Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

     B.    Federal Review of State Court Decision

The Rule 3.850 court denied relief, finding:  "This too is information that was placed on the record at the suppression hearing and this testimony would not have changed the outcome of the suppression hearing."  (Doc. 50, Ex. M, p. 178).  The state appellate court summarily affirmed.

That aspect of D'Wayne Johnson's proposed testimony concerning where he got the information about petitioner's address, and what Mr. Davey told Deputy Johannis, is cumulative to Mr. Davey's e-mails, Captain Stanford's testimony and Deputy King's testimony.  (*See* Doc. 14, Ex. D, pp. 316, 319, 322-24, 328).  That aspect of Johnson's proposed testimony concerning Mr. Cheek's description of the suspect vehicle, Mr. Cheek's denial of the vehicle's identity at 909 Kraft Avenue, and the State Attorney's advice to include Cheek's denial in the warrant affidavit, is cumulative to Captain Stanford's testimony.  (Doc. 14, Ex. D, pp. 310-11).  As with Grounds 2 and 3 above, the state court reasonably concluded that defense counsel was

not ineffective for failing to present additional evidence (in this case, Johnson's testimony) that was merely repetitive and cumulative to that which was presented. The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

Ground 5     Trial counsel was ineffective for failing to subpoena Kevin Cheek to testify at the suppression hearing

Petitioner faults trial counsel for failing to call Kevin Cheek to testify at the suppression hearing. Petitioner asserts that Mr. Cheek would have testified that he was the eyewitness who saw the car leave the bank; that the car he saw at 909 Kraft Avenue was not the car he saw leaving the bank; and that he was the only witness law enforcement brought to 909 Kraft Avenue to identify the car. (Doc. 30, continuation page 5). Petitioner argues that had the trial court heard Cheek's testimony, the court would have found that law enforcement did not have probable cause or a good faith basis to detain petitioner or search the car parked outside of 909 Kraft Avenue. (*Id.*, p. 6). The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding. (Doc. 46, p. 19).

A.     Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.


B.     Federal Review of State Court Decision

The Rule 3.850 court denied relief, explaining: "This is the same information Defendant claims he was prejudiced by the exclusion of in Ground Four. This is also the same information that was placed on the record at the suppression hearing. Thus,

Defendant was not prejudiced by counsel's failure to subpoena Mr. Cheeks."  (Doc. 50, Ex. M, p. 179) (citations to record omitted).  The state appellate court summarily affirmed.

Mr. Cheek's proposed testimony was entirely cumulative to Captain Stanford's testimony.  Petitioner fails to show deficient performance or prejudice from counsel's failure to present cumulative evidence.  *See* discussion *supra* Grounds 2-4.  The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 6</u>    <u>Trial counsel was ineffective for failing to move to suppress the photo lineup as impermissibly suggestive</u>

Petitioner asserts that prior to trial, Prosperity Bank employee Heather Brewer identified petitioner as the bank robber from a police photo lineup that was impermissibly suggestive.  Petitioner asserts that the lineup was impermissibly suggestive, because Brewer had given a description of the bank robber as a black male with dreadlocks and a black beard, and the photo lineup presented to Ms. Brewer consisted of six black males with only one of them (petitioner) having dreadlocks and a black beard.  Petitioner faults trial counsel for failing to move to suppress Ms. Brewer's out-of-court identification.  (Doc. 30, continuation pages 6-7). The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, p. 19).

A.    Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.    Federal Review of State Court Decision

The Rule 3.850 court identified *Strickland* as the controlling legal standard (doc. 50, ex. O, p. 741-42), and denied relief after concluding that a motion to suppress the photo lineup as impermissibly suggestive "would have been without merit," and petitioner failed to show any prejudice from admission of the identification. (Doc. 50, Ex. O, p. 743). The state court's determination was supported by detailed findings:

> While the Defendant alleges that Ms. Brewer vaguely described the suspect as a "black male with dread locks and a black beard," and the Defendant was the only suspect in the photo lineup with all these characteristics, the record reflects that Ms. Brewer made no mention of the suspect's hairstyle. Ms. Brewer only described the suspect as an individual wearing dark clothing, with a black toboggan on his head and a beard that was "very, very black" and looked almost fake. (08-1170-H Tr. at 28, 32.) In her August 12, 2008 [deposition] Ms. Brewer gave essentially the same description with no mention of the suspect's hair style. (Brewer Dep. at 4.) The investigator who prepared the photographic lineup also testified on cross-examination that according to his information, the robber had a beard. (Tr. at 93.) In Investigator Larson's [sic] affidavit in support of the search warrant for 909 Kraft Avenue, he noted that based on the Prosperity Bank surveillance video, a black male in dark colored clothing, with a dark colored mustache and beard robbed the bank. (Def.'s Mot. to suppress, Ex. C.) Inv. Larson [sic] also noted that witnesses outside the bank stated that the possible suspect vehicle was "operated by a black male, possibly having dread locks." Id. Later, an unidentified neighbor stated that she observed two individuals working on the suspect vehicle; she described one as having dread locks and the other as having a mustache and a beard. Id. While it does appear that in the aggregate, the police's information was that the suspect [was] a black male with dreadlocks and a beard, the only information gleaned from Ms. Brewer was that the suspect had a very dark beard. At least three of the individuals in the photo lineup that was shown to Ms. Brewer had beards.

Even if the court were to agree that the lineup was impermissibly suggestive, given the entire description the police had, the second prong of the test has not been met. Ms. Brewer's trial testimony revealed that she had ample opportunity to view the Defendant at the time of the crime, that she was paying attention, that she was immediately certain when she picked the Defendant's picture out of the photographic lineup, and that only 6 days passed between the robbery and her identification. (See 08-1170-H Tr. at 25-42.) Accordingly, it cannot be said that, in light of all of the circumstances, there was a substantial likelihood of irreparable misidentification. See State v. Billue, 497 So.2d 712 (Fla. 4th DCA 1986). Thus, any motion to suppress filed by trial counsel on this basis would have been without merit. Counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding. Teffeteller v. Dugger, 734 So.2d 1009, 1023 (Fla. 1999).

(Doc. 50, Ex. O, pp. 742-43). The state court went on to discuss that petitioner failed to show any prejudice from the admission of Brewer's out-of-court identification. (Id., p. 743). The state appellate court summarily affirmed.

Florida law and Federal law provide the same test for evaluating challenges to out-of-court identifications on the grounds of an impermissibly suggestive confrontation procedure. "[T]he appropriate test is twofold: (1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification." Grant v. State, 390 So.2d 341, 343 (Fla. 1980) (citing Manson v. Brathwaite, 432 U.S. 98, 110, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). The factors to consider in evaluating the likelihood of misidentification include

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the

witness at the confrontation, and the length of time between the crime
and the confrontation.

*Grant* at 344 (*quoting Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L.
Ed. 2d 401 (1972)).

All of the state court's factual findings are reasonable, including its
determination that petitioner's central premise – that he was the only person in the
photo array that matched Ms. Brewer's physical description – was rebutted by the
record.  The photo lineup was based not only on Ms. Brewer's description of the
robber, but also on other witnesses' descriptions and the surveillance video.  Ms.
Brewer's statement to police described the robber as an African-American male
wearing dark clothing and a toboggan, and having a beard that was "very black . . .
that looked dyed."  (Doc. 50, Ex. O, p. 742; Doc. 14, Ex. F, p. 32; Doc. 30, Ex. F).
Ms. Brewer's deposition taken on August 12, 2008 described the robber as "a black
male wearing a black T-shirt and jeans and had a black toboggan on his head with a
black beard . . . a very thick, black beard."  (Doc. 50, Ex. P, p. 885).  The surveillance
video from all three of the robbed banks revealed that the robber was a black male
wearing dark clothing, a dark colored toboggan, and a dark colored mustache and
beard.  (Doc. 14, Ex. A, p. 23).  A witness outside Prosperity Bank made reference
to the suspect having "possible dreadlocks."  (*Id.*).  Petitioner was the only man in the
lineup with a beard <u>and</u> dreadlocks; however, Ms. Brewer was not one of the
witnesses who described the robber's hair – she indicated that the robber's "toboggan
. . . was pulled down, you know, pretty far.  You couldn't really see too much."  (Doc.
30, Ex. F).  Brewer's description of a black man with a black beard matched the
physical description of at least three other men in the six-photo lineup.  (Doc. 30, Ex.
A; Doc. 50, Ex. L, pp. 132-33 (providing a better image of the photo lineup); Ex. M,

p. 329; Ex. O, p. 742).  There is nothing to suggest that the hair styles of the men in the lineup had anything to do with Ms. Brewer's identification.

As the photo lineup was not impermissibly suggestive to Ms. Brewer, there was no valid legal basis for trial counsel to challenge the lineup or Brewer's out-of-court identification.   Counsel is not ineffective for failing to argue a meritless claim. *Freeman v. Attorney Gen., Fla.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim. . . ."); *see also Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (concluding that counsel was not ineffective for failing to raise issues clearly lacking in merit); *Bolender v. Singletary*, 16 F.3d 1547, 1473 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."); *Lamontagne v. Sec'y, Dep't of Corr.*, 433 F. App'x 746, 749-50 (11th Cir. 2011) (holding that because the petitioner's ineffective assistance claim was based on the faulty assumption that he had a viable motion to exclude evidence from being admissible in his criminal case, the state court reasonably concluded that the petitioner could not show either deficient performance or resulting prejudice under *Strickland*). Moreover, petitioner cannot show prejudice, because even if trial counsel suppressed Ms. Brewer's out-of-court identification, the result of petitioner's trial would have been the same because the remaining evidence amply established that petitioner was the robber.

The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 7</u>    <u>Trial counsel was ineffective for failing to object to the trial court declining to answer jury questions</u>

During deliberations, the jury sent four notes to the judge, with the following results:

1. "We would like to see the Defendant in person, full profile, without glasses and see him walk across the room.  Also we would like to see the surveillance video." (Doc. 14, Ex. F, p. 157).  The trial judge expressed confusion with the jury's request to see petitioner without glasses, because petitioner had not worn glasses during trial.  (*Id*., p. 158).  The attorneys agreed that the jury would not be permitted to view petitioner walk across the room, but that they would be permitted to view the surveillance video again.  (*Id*., pp. 158).  The jury was brought back into the courtroom and viewed the surveillance video.  (*Id*., pp. 159-60).

2. "When was the line-up picture taken used by tellers to ID?"  (*Id*., p. 161).  The parties agreed that the judge would respond by saying, "You have all of the information we can give you.  I cannot answer this question any further."  (*Id*.).

3. "Is the 'mug shot' of the Defendant current?  One juror will not make a decision without the date of the 'mug shot.'  If you cannot give it to us then we have a problem." (*Id*., p. 161).  The trial judge and the attorneys expressed confusion over what the jury meant by "mug shot," and agreed that the judge could not provide the jury with any further evidence.  (*Id*., pp. 161-62).  The judge called the jury into the courtroom and provided this response: "Members of the jury thank you for your note but I am not able to answer the question because the only evidence that you have is what has been given to you and you have to

rely on your own recollection and I can't add anything else to what's already been given to you.  Did you have any other questions or comments you wanted to make at this time?"  (*Id*., p. 163).  Juror Goodway responded: "Not that we didn't already ask." (*Id*.).  The jury was instructed to "go and deliberate further then." (*Id*.).

4.  "We have a problem, Houston!  What about the alternate?" (*Id*., p. 163).

The trial judge brought the jury into the courtroom and responded:

Members of the panel, I have received your latest note. You are the jury to try this case, we can't substitute members for the alternate with one of your existing members, you are the jury. I am gonna read you another instruction and then we can go from there.  I have to read this to you also.  I know that all of you have worked hard to try to find a verdict in this case.  It apparently has been impossible for you so far.  Sometimes an early vote before discussion can make it hard to reach an agreement about the case later.  The vote, not the discussion, might make it hard to see all sides of the case.  We are all aware it's legally permissible for a jury to disagree.  There's two things that a jury can lawfully do. Agree on the verdict or disagree on what the facts of the case may truly be.  There's nothing to disagree about on the law.  The law is as I told you.  If you have any disagreements about the law, I should clear them up for you now.  That should be my problem, not yours.  If you disagree over what you believe the evidence showed then only you can resolve that conflict, if it is to be resolved.  I have only one request for you.  By law I cannot demand this of you, but I want you to go back into the jury room and then taking turns tell each of the other jurors about any weakness of your own position.  You should not interrupt each other or comment on each other's views until each of you has had a chance to talk.  After you have done that, if you simply cannot reach a verdict then return to the courtroom and I will declare this case mistried and will discharge you with my sincere appreciation for your services.  I ask you to now retire and continue with your

deliberations.

(*Id.*, pp. 164-65).

Petitioner faults trial counsel for failing to object to the court's declining to answer the jury questions in their entirety.  Petitioner asserts with regard to the last question, that the judge should have declared a mistrial as soon as the jury stated they had a problem if they could not get the date of the photo lineup, and that the judge's request for the jurors to go back into the jury room and take turns identifying the weaknesses in their own positions "cause[d] the jury to find petitioner guilty." (Doc. 30, continuation pages 8-9).  To support his claim of prejudice, petitioner asserts that the fact that the jury came back with a guilty verdict just a few minutes after the judge made her "request" establishes a reasonable probability that the "request" affected the outcome of the trial.  (*Id.*, continuation page 9).  The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, pp. 21-22).

A.    Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.    Federal Review of State Court Decision

The Rule 3.850 court denied relief, noting at the outset that it was necessary to review each jury request "to determine whether counsel's objection would have been sustained or whether there is a reasonable probability that the objection would have preserved an error that would have resulted in reversal on appeal." (Doc. 50, Ex. M, p. 179).  The state court found that displaying petitioner "full profile" and "walking across the room" constituted new, additional evidence that the jury had not seen during the trial.  The court made the same findings as to the date of petitioner's

"mug shot" and the date of petitioner's photograph used in the photo lineup.  The dates were "facts," and evidence of those facts would be "new evidence" presented after the case was submitted to the jury.  (*Id*.).  The court determined that Florida law prohibits the presentation of new evidence after the court submits the case to the jury, and therefore any objection to the trial judge's declining the jury's requests would have been overruled as a matter of law.  (Doc. 50, Ex. M, p. 179 (*citing Scott v. State*, 664 So.2d 3 (Fla. 3d DCA 1995); Fla. R. Crim. P. 3.430; and *Infantes v. State*, 941 So.2d 432, 434 (Fla. 3d DCA 2006)).   As petitioner failed to show deficient performance or prejudice arising from counsel's failure to object, petitioner's ineffective assistance claim was without merit.  The state appellate court summarily affirmed.

This Court defers to the state court's reasonable factual findings that those jury requests declined by the trial judge required the presentation of new evidence.  This Court also defers to the state court's interpretation of Florida law as prohibiting the presentation of new evidence after the case has been submitted to the jury. Petitioner's contention that the state court unreasonably applied *Strickland* obviously depends upon this Court determining that trial counsel's failure to object was deficient and prejudicial, but first this Court would have to conclude that the state court misinterpreted state law when it held that petitioner's proposed objections would have been overruled.  It is a "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters."  *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997) (citations omitted).  The state court has answered the question of what would have happened had trial counsel objected to the trial court's refusal to allow the jury to receive the

new evidence – the objection(s) would have been overruled.  Accordingly, petitioner cannot establish deficient performance by trial counsel or prejudice, under *Strickland*. *See, e.g., Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [defense counsel] objected to the introduction of [the petitioner's] statements based on [state law] – the objection would have been overruled. Therefore, [defense counsel] was not ineffective for failing to make that objection. . . . [A petitioner] cannot be prejudiced by his counsel's failure to make a losing objection.") (citations omitted); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [defense counsel] done what [the petitioner] argues he should have done – objected to the State's cross-examination. . . . Accordingly, with regard to this claim, we hold [petitioner] cannot establish either deficient performance by [counsel] or prejudice."). Although a federal court will grant habeas relief if application of a state law violates a specific federal constitutional right or if a state trial judge's erroneous admission or exclusion of evidence makes a petitioner's trial "so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment," *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991) (citations omitted), neither circumstance is present in this case.

The same is true of counsel's failure to object to the trial judge's *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528 (1896) (holding that it is not error to charge the jury, on their return for further instructions, that they should examine the question submitted with candor and with a proper regard

and deference to the opinions of each other; that it is their duty to decide the case, if they can conscientiously do so; that they should listen to each other's arguments with a disposition to be convinced; that if the majority is for conviction, a dissenting juror should consider whether his doubt is a reasonable one; and that if a majority is for acquittal, the minority juror should consider whether he may not reasonably doubt their judgment).  The state court found as fact that the trial judge's "request" or instruction was taken directly from the *Allen* charge as shown in the Florida Standard Jury Instructions.  (Doc. 50, Ex. M, pp. 179-80 (*citing* Fla. Std. Jury Instr. (Crim.) 4.1; Trial Transcript at 163-165)).  Based on this finding, the state court concluded that the trial judge's "request" was not improper or objectionable, and that counsel was not deficient in failing to object.  (*Id.*, p. 180).

The state court answered the question of what would have happened had defense counsel objected to the trial judge's *Allen*-type "request" – the objection would have been overruled because the request was permissible under state law.  This Court will not second-guess the state court's interpretation of its own laws.  Defense counsel was not deficient for failing to make a losing objection, and petitioner was not prejudiced by counsel's failure to do so.

The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

Ground 8      Trial counsel was ineffective for failing to strike Juror James Burke

Petitioner claims trial counsel was ineffective for failing to "strike" Juror James Burke, after counsel became aware that Burke was tainted by "knowledge of petitioner's past crime history."  (Doc. 30, continuation page 9).  In support,

petitioner asserts that the jury was selected on October 27, 2008; that Burke and the other jurors were allowed to go home until trial commenced on October 30, 2008; and that when Burke returned on October 30, 2008 he admitted "to looking at the news and reading about the petitioner's past crime history, etc." and to seeing "the news about the bank that was robbed." (*Id.*). Petitioner argues that "had trial counsel struck Mr. Burke from the jury, the outcome would have been different" because Burke "would have not been able to share his knowledge of petitioner's past crime history with the jury." (*Id.*). The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding. (Doc. 46, p. 22).

A.    Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.    Federal Review of State Court Decision

The Rule 3.850 court denied relief explaining, in relevant part:

> A defendant alleging that counsel was ineffective for failing to object or preserve a claim of reversible error in jury selection must demonstrate prejudice at the trial. Carratelli v. State, 961 So.2d 312, 323 (Fla. 2007). To establish prejudice, Defendant must demonstrate that an underlying biased juror served on the jury. . . . Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial – i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record. Carratelli, 961 So.2d at 324. In this case, there is no evidence of actual bias on the face of the record. During voir dire, the Assistant State Attorney inquired as to whether anyone had heard or read anything about the bank robbery. Juror Burke indicated that he heard that the bank was robbed. The ASA then asked Juror Burke whether that would influence him as a juror in any way and Juror Burke responded in the negative. See Jury Selection Transcript at 35-36. When the selected jury returned for the

trial, the court asked whether anyone had read or listened to any reports about the case since the jury selection.  Juror Burke indicated that he had.  When the Court excused the rest of the jury to inquire further, Mr. Burke said that he hadn't heard anything new since the jury selection. <u>See</u> Trial Transcript at 11-12.  Mere exposure to pre-trial publicity does not automatically form the basis of a for cause challenge.  <u>See</u> <u>Dillbeck v. State</u>, 964 Fo.2d 95, 102 (Fla. 2007).  The face of the record is devoid of any evidence of actual bias with regard to Juror Burke.  Moreover, there is nothing in the record which supports Defendant's contention that Juror Burke had knowledge of the Defendant's past criminal history and that he shared this information with the jury.  Accordingly, Defendant has failed to establish that there was any evidence of actual bias that is plain on the face of the record and his claim is due to be denied on this ground.

(Doc. 50, Ex. M, p. 180).  The state appellate court summarily affirmed.

The state court reasonably found that there was no evidence to support petitioner's allegation that Juror Burke was biased or that Juror Burke knew anything about petitioner's criminal history.  The record establishes that during voir dire, the prosecutor asked the venire:  "Does anybody know anything about the case?  And, when I say that, have you read anything about it, heard anything about it, or heard street talk about it?"  (Doc. 14, Ex. C, p. 31).  Mr. Burke responded, "Just hearing a bank was robbed, that was it."  (Doc. 14, Ex. C, p. 36).  The prosecutor asked Mr. Burke if that would influence him as a juror in any way, and Mr. Burke responded, "No."  (*Id*.).  Mr. Burke was selected to be on the jury.  On the first day of trial, defense counsel advised the trial judge that the morning after jury selection a newspaper article appeared in the <u>News-Herald</u>.  Defense counsel described the article:

It's a newspaper article about this case.  It includes information about Mr. Allen's past and also some other pending matters that are not the

subject of this trial.  You had instructed the jurors to not read or listen to any reports about the case but I would just ask that you inquire of the jury if they had read and if they had, any appropriate inquiries thereafter.

(Doc. 14, Ex. F, p. 6).  The judge inquired of the jurors whether anyone "read or listened to any reports about this case since Monday."  (Ex. F, p. 11).  Juror Burke nodded.  The other jurors were sent to the jury room and Juror Burke was interviewed outside the presence of the other jurors:

THE COURT:  I just didn't want you to say anything that might influence anyone else.  Mr. Burke –

JUROR BURKE:  I really got nothing to say, just what I said when we were, we just heard, heard on the news or whatever there was a bank robbery, that was it.

THE COURT:  Okay, but nothing new since –

JUROR BURKE:  No, I don't know who the fellow's name was that robbed the bank.

THE COURT: So you haven't heard or read or –

JUROR BURKE:  No, ma'am.

THE COURT:  – know anything else than you knew on Monday?

JUROR BURKE:  No, ma'am, just what I said when we were in here the first time.

THE COURT;  Okay, I was looking for new stuff, but no new stuff?

JUROR BURKE:  No, no new stuff.

(Doc. 14, Ex. F, pp. 11-12).

The state court reasonably concluded that there was no basis for counsel to

move to strike or remove Juror Burke for bias.  Petitioner's speculation that Juror Burke was biased and that he learned of and shared petitioner's criminal history with the rest of the jury has no support in the record, and provides no basis to find either that counsel was deficient for failing to request Burke's removal, or that petitioner was prejudiced by counsel's failure to act.

The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 9</u>      <u>Trial counsel was ineffective for failing to object to the racial make-up of the jury</u>

Petitioner claims trial counsel was ineffective for failing to "object to the '<u>racial</u>' make-up of the jury composition of an '<u>all white jury</u>' who had friends and relatives and ties to the Bay County Law Enforcement and Judicial Officers and trial judge." (Doc. 30, continuation pages 10-11).  To support this claim, petitioner states that his jury was all white; that three jurors (Houser, Goodway and Harris) had relatives or friends who were in law enforcement; that Juror Burke "watched the news of petitioner on TV, read about petitioner's past crime history, [and] shared it with the jury;" that Juror Cuthbest was the victim of a robbery; that Juror Hollingsworth's niece was married by the trial judge and was the victim of a robbery; and that Juror Harris' sister worked for a bank that was robbed.  (*Id*.).  Petitioner concludes that he "was prejudiced by trial counsel when he failed to object to this '<u>all white</u>' jury composition.  Due to trial counsel's unprofessional error the court should find that petitioner's trial counsel's performance was deficient and that it affected the outcome of the proceeding." (*Id*., continuation page 11).  The parties agree that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 46, pp. 22-23).

A.    Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.    Federal Review of State Court Decision

The Rule 3.850 court denied relief, explaining that petitioner did not assert, or attempt to make a showing, that the jury was selected in a manner that unconstitutionally discriminated on the basis of race.  (Doc. 50, Ex. O, p. 743).  The court further found that petitioner made no showing that an actually biased juror served on his jury, and that the transcript of jury selection did not evince any actual bias or illegal discrimination.  The court made a final note:

> [B]efore the jury selection began, the court specifically explained how the jury selection process worked [and] instructed the Defendant to let his lawyer know if he did not want one of the jurors.  (Jury Selection Tr. at 2-3.)  Defendant later stated that he was personally satisfied with the jury after the challenge conference.  (Id. at 59-61.)  Thus, the Defendant cannot now complain that he was not satisfied with the composition of the jury.

(Doc. 50, Ex. O, pp. 743-44).  The state appellate court summarily affirmed.

Petitioner provides no information as to the race of the venire, nor any evidence whatsoever of any perceived racial bias or discrimination in the selection of the jury panel or the six members of his jury.  As to the other alleged factors that could have made jurors more inclined to convict than to acquit, each juror was specifically asked about each fact petitioner now challenges, and each responded that he or she could be fair and impartial and would not be influenced in any way by that factor.  (Doc. 14, Ex. C, pp. 18, 23, 24, 25, 26, 36, 38-39, 40, 43).  After the jury was selected, the trial judge asked petitioner if the jury was agreeable to him, and petitioner responded

"Yes, ma'am." (*Id.*, p. 61).   As the state court reasonably found, petitioner's speculation of bias is unsubstantiated –  and indeed rebutted – by the record.   The state court reasonably concluded that petitioner failed to establish any legal basis for counsel to object to either the racial makeup of the jury or any particular juror; that counsel was not deficient for failing to object; and that there was not a reasonable probability the outcome of petitioner's trial would have been different had counsel made petitioner's proposed objections.

The state court's rejection of petitioner's ineffective assistance claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.

<u>Ground 10</u>   <u>The cumulative effect of trial counsel's errors was tantamount to a complete deprivation of petitioner's Sixth Amendment right to counsel and Fourteenth Amendment right to due process</u>

Petitioner asserts that the cumulative effect of the errors alleged in Grounds 1-9 deprived him of his right to the effective assistance of counsel.   (Doc. 30, continuation page 11).   Petitioner raised this claim in his Rule 3.850 proceeding. (Doc. 50, Ex. L, p. 127).   The Rule 3.850 court denied relief, explaining that "[b]ecause all of the Defendant's claims are without merit, this ground is due to be denied as well." (Doc.  50, Ex. O, p. 745).   The state appellate court summarily affirmed.

A claim of cumulative ineffectiveness fails if the individually alleged instances of ineffectiveness are without merit.   *Sims v. Singletary*, 155 F.3d 1297, 1309 (11th Cir. 1998); *cf., United States v. Culver*, 598 F.3d 740, 751 (11th Cir. 2010) (doctrine of cumulative trial error does not apply where the trial court commits no individual errors); *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004) (holding that

where there is no error or only a single error, there can be no cumulative error);
*United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful
errors, there can be no cumulative effect compelling reversal."); *Mullen v. Blackburn*,
808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his
assertion, which, if adopted, would encourage habeas petitioners to multiply claims
endlessly in the hope that, by advancing a sufficient number of claims, they could
obtain relief even if none of these had any merit.  We receive enough meritless habeas
claims as it is; we decline to adopt a rule that would have the effect of soliciting more
and has nothing else to recommend it.  Twenty times zero equals zero.").  Petitioner's
individual claims of ineffective assistance have no merit; therefore, petitioner's
cumulative error claim must fail.

The state court's rejection of petitioner's cumulative error claim was not
contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and
was not based on an unreasonable determination of the facts.

Ground 11   Petitioner was subjected to an illegal search and seizure, and the trial
court improperly denied his motion to suppress

Petitioner asserts that the search warrant was unconstitutional, because it was
based on a flawed affidavit that, when considered in its entirety, did not establish
probable cause to search the car.  (Doc. 30, continuation pages 12-13).  Petitioner
argues that law enforcement "needed" a connection between petitioner and the 909
Kraft Avenue address in order to obtain the search warrant, and that had the correct
information been included in Johnson's affidavit, there would have been insufficient
evidence tying petitioner to the house at 909 Kraft Avenue and, correspondingly,
insufficient evidence to establish probable cause to search the house or the red car.
(*Id*.)

Petitioner raised his claim by a motion to suppress.  (Doc. 14, Ex. A, pp. 17-24).  A hearing was held and the motion was denied.  (Doc. 14, Ex. D).  The state trial court made explicit findings on matters essential to the Fourth Amendment issue:

THE COURT:  . . . [O]kay, number one, I find that the Sheriff's Department was acting in good faith.  I don't see any signs that they did anything in bad faith to intentionally mislead Judge Sirmons.  They had that information and in reading carefully what Mr. Davey said . . . [summarizing Davey's e-mails], this information . . . and then the information the Sheriff's Office found out as to Brandy Austin with the 909 Kraft Avenue address from some confrontation she was in with the neighbors or people living there.

All of that is inevitable information, inevitable discovery, they would have discovered it had they not relied on what appears, has turned out to be the wrong information even though it was done in good faith. It would have been probably a little better practice to have added that information about Ms. Austin in there that they did know and then we would have had it.  It certainly would have been a better practice also to added in the information that the witness said, it wasn't the car. However, it is, looking at the car and looking at the original description given as to the car with the white stuff on the front of the car with the emblem, is a little, kind of marks it as not your regular red Chevy.  That is different.  So I think with that information they could have discovered more information.

The Georgia, the tag also connects him up to Georgia because they did have information that he had lived in Georgia and that's corroborated by what Mr. Davey said.

So, the only problem is to make sure we can tie in the car to the defendant.  And I think based, and it's probably narrow and it's probably a light connection but I think it's sufficient under these circumstances. The specific nature of the car, the footprints, the Georgia connections, all of that, and the dreadlocks, which we've agreed he had dreadlocks at the time of this arrest.  Correct, Mr. Meredith, at the time of his arrest?

MR. MEREDITH [defense counsel]:  I'm not sure it's dreadlocks.  It's kind of twisty, twist knots.

THE COURT:  Okay.  Long hair.

MR. MEREDITH:  His hair was longer than it is now but it wasn't –

THE COURT:  Okay, now it's quarter of an inch long, maybe.  I mean, it's not very long, it's not very, it's close shaven, to my taste.

So, and the question of the bag.  The bag was, even if all of this is not admissible the bag was dropped.  I do think that they had the right to be there while investigative and once he abandoned the bag, the bag is admissible with the money in it.

So I'm going to deny the Motion to Suppress.

(Doc. 14, Ex. D, pp. 348-51).  Petitioner obtained review of the issue on direct appeal. (Doc. 14, Ex. G).  The state appellate court affirmed petitioner's convictions without written opinion.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494, 96 S. Ct. 3037, 3052, 49 L. Ed. 2d 1067 (1976) (footnotes omitted); *see also, Devier v. Zant*, 3 F.3d 1445, 1455 (11th Cir. 1993) (holding that where Fourth Amendment claims were raised by motion to suppress and on appeal they were given a full and fair hearing and therefore barred under *Stone*).  Petitioner has not shown that he was not given a full and fair hearing on this issue.  Ground Eleven affords no basis for federal habeas relief.

Ground 12   Mistaken identity and perjury

Petitioner labels this claim as one of "Mistaken Identity and Perjury," but the essence of petitioner's claim is that trial counsel was ineffective for failing to "argue" certain "facts" on the issue of identification.  Petitioner asserts that Ms. Jeanne Floyd, a Prosperity Bank employee, "gave false testimony about the identity of the petitioner at trial" when she identified petitioner as the bank robber.  (Doc. 30, continuation page 14).   In support, petitioner alleges that Ms. Floyd testified in a pre-trial deposition (held on August 12, 2008) that the robber was:  "Black male, 5'10" tall, 170 to 180 lbs, 45 years or older," and told police on the day of the robbery that the robber was:  "Black male, 30 years old; 5'6" [or 5'10"] tall, 130 lbs."  (Doc. 30, continuation page 14 and Ex. F).  Petitioner suggests that Ms. Floyd's identification of petitioner as the bank robber was "false," because at the time of Ms. Floyd's deposition petitioner "was 59 years old, 180 lbs, black male with short hair, no 'dreadlocks' with a gray beard."  (*Id*.).

Petitioner also challenges Ms. Heather Brewer's in-court identification of petitioner as the bank robber.  Ms. Brewer was the teller petitioner robbed at Prosperity Bank.  Petitioner faults trial counsel for failing to "argue" that:  (1) Ms. Brewer did not give a description of the bank robber on the day of the robbery; (2) the description Ms. Brewer gave at her August 12, 2008 pre-trial deposition was "coerced by Bay County Law Enforcement"; (3) the surveillance video of the robbery showed that Ms. Brewer never looked at the bank robber; and (4) the surveillance video established that the robber was only in the bank for one minute and forty-five seconds.  (Doc. 30, continuation page 14).

As a final point, petitioner emphasizes that the State's expert witness, Christopher Iber, who was qualified as an expert in the field of image analysis (doc.

14, ex. C, p. 105), was unable to identify petitioner as the robber in the bank surveillance video even after analyzing the video with a digital computer. Petitioner asserts that had trial counsel "argued these '<u>facts</u>,'" the outcome of petitioner's trial would have been different. The parties agree that petitioner raised this ineffective assistance claim in his Rule 3.850 proceeding. (Doc. 46, p. 29).

A.     Clearly Established Federal Law

The clearly established Federal law governing ineffective assistance claims is set forth above.

B.     Federal Review of State Court Decision

The Rule 3.850 court denied relief as follows:

> In Ms. Floyd's statement to police taken on the day of the robbery, she described the robber as having a beard, being about "5'5", 5'6", 5'10"," that he "was medium build so I'm guessin' oh a hundred and fifty, somethin' like that," and as being in his thirties. (<u>See</u> attached Statement of Jeanne Floyd). In her deposition, she described the robber as being of medium build, "five-ten, I'm guessing there," with a beard and short dreadlocks, in his 30s or 40s. (<u>See</u> Jeanne Floyd Dep. at 4.) These statements were not contradictory. Ms. Floyd did not give a description at trial, but counsel cross-examined her on the fact that she had previously described the robber as being in his 30s. (<u>See</u> Tr. at 48-50). Counsel also argued in closing that Ms. Floyd only had one brief encounter with the robber and yet she was sure of the identification. (<u>id.</u> at 137).

> Defense counsel cross-examined Ms. Brewer regarding whether she had time to observe the Defendant and on having her head down in the [surveillance] video. (<u>Id.</u> at p. 39-40.) He argued on cross-examination that the jurors could see on the video that she kept her eyes on her cash drawer and that the whole encounter was only a minute and a half. (Id. at 135-136.)

Mr. Iber testified at trial that he could not make a positive identification of the Defendant, nor could he eliminate him. (Id. at 102-115.)  Defense counsel argued this point in closing.  (Id. at 137-138.)  Similarly, the crime scene investigator testified at trial that she was unable to obtain any fingerprints from the bank counter and doors.  (Id. at p. 67-68.)   Additionally, the FDLE analyst who compared the notebook found in the Defendant's car with the note the robber gave Ms. Brewer also had expertise in fingerprinting, and counsel cross-examined him about the hard marble surface of the counter that the robber had touched being a good surface for getting fingerprints from.  (Id. at 122.)  Counsel also argued about the lack of a fingerprint match in closing.  (Id. at 139.)

It is clear that the Defendant has failed to establish deficient performance by defense counsel.  In addition to cross-examining the witnesses as outlined above, defense counsel did in fact argue in closing that this was a case of mistaken identity.  (Id. at 135-139.).  To the extent the Defendant argues the sufficiency of the evidence, such a claim is not cognizable in a motion for postconviction relief.  See Betts v. State, 792 So. 2d 589 (Fla. 1st DCA 2001).

(Doc. 50, Ex. O, pp. 744-45).  The state appellate court summarily affirmed.

The state court reasonably found that the inconsistencies upon which petitioner bases this claim were largely not borne out by the factual record and to the extent they were, counsel did attempt to impeach both Ms. Brewer's and Ms. Floyd's in-court and out-of-court identifications of petitioner, as well as Mr. Iber's testimony.  In addition, counsel brought out in closing argument all of the points petitioner faults counsel for failing to argue.  (See Doc. 14, Ex. C, pp. 135-39).

The state court's rejection of petitioner's claim was not contrary to clearly established Federal law, did not involve an unreasonable application of clearly established Federal law, and was not based on an unreasonable determination of the facts.  Petitioner is not entitled to federal habeas relief.

<u>Ground 13</u>   <u>Witness perjury where the State gave Michael Allen $300 to testify that he was petitioner's brother</u>

Petitioner claims he "was prejudiced by the court when the State subpoenaed their 'key' witness, Mr. Michael Allen for $300.00 to testify he was the petitioner's brother." (Doc. 30, continuation page 15).  Michael Allen testified that petitioner was his brother (more specifically, his stepbrother), and that petitioner was the bank robber appearing in one of the bank's surveillance videos.  (Doc. 14, Ex. F, pp. 51-54).  Petitioner takes issue with the fact that Michael Allen received a $300.00 reward from the Bay County Sheriff's Office after he identified petitioner as the bank robber, and asserts that "D.N.A. will prove that Mr. Michael Allen is not the petitioner's brother."  (*Id.*, continuation pages 15-16).  Respondent asserts a procedural default defense, arguing that petitioner has not presented this claim to the state courts and is now barred by state procedural rules from returning to state court to litigate the claim.  (Doc. 46, p. 29).  Petitioner responds that he presented this claim to the state courts in his Rule 3.850 proceeding.  (Doc. 52, p. 4).

A.     Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1),[2] thereby giving the state the "'opportunity to pass upon and correct'

---

[2]Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (*quoting Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  The petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277-78.  A claim that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S. Ct. 1728; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (holding that federal habeas courts should enforce applicable state procedural bars even as to claims that were never presented to the state courts).  A claim is also considered procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876

---

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991).   In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.   *Bailey*, 172 F.3d at 1303.   In the second instance, the federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.   *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).   The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.   *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).   The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.   *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

A petitioner seeking to overcome a procedural default must show cause and prejudice, or a fundamental miscarriage of justice.   *Tower*, 7 F.3d at 210.   "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."   *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (*quoting Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).   The miscarriage of justice exception requires the petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."   *Schlup v. Delo*, 513 U.S. 298, 327, 115

S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  *Schlup*, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.

*Id*.

Petitioner raised this claim in his Rule 3.850 motion as Ground 12.  (Doc. 50, Ex. L, p. 126).  The Rule 3.850 court applied the firmly established and regularly followed state procedural rule that the claim was procedurally barred because it should have been raised on direct appeal.  (Doc. 50, Ex. M, pp. 180-81) ("Any claim relating to trial court error must be raised on direct appeal and is procedurally barred from consideration in postconviction proceedings.  See Robinson v. State, 913 So.2d 514, 524 n. 9 (Fla. 2005).  Thus, Ground Twelve is due to be denied.").  The state appellate court affirmed the lower court's decision.  Petitioner's procedural default bars federal habeas review of this claim.

Petitioner has not shown "cause" for his default such that this Court may address the claim.  Petitioner argues that "[t]his claim was not in petitioner['s] direct appeal because his counsel was ineffective assistance of counsel."  (Doc. 52, p. 4).  Petitioner did not raise an ineffective assistance of appellate counsel claim in state court, nor did he raise this particular ineffective assistance of trial counsel claim in his Rule 3.850 motion.  Petitioner is precluded from now seeking review of either claim in state court.  Petitioner's proposed ineffective assistance claim is procedurally

defaulted and cannot be considered as cause for the default of his trial court error claim. *See Edwards v. Carpenter*, 529 U.S. 446, 450-51, 120 S. Ct. 1587, 1591 (2000) (concluding that a federal habeas court is barred from considering a procedurally defaulted ineffective assistance of counsel claim as cause for procedural default of another claim); *Hill v. Jones*, 81 F.3d 1015, 1029-31 (11th Cir. 1996); *see also Dowling v. Sec'y, for Dep't of Corr.*, 275 F. App'x 846, 847-48 (11th Cir. 2008) (holding that prisoner's ineffective assistance of appellate counsel claim was procedurally defaulted and could not be considered as cause for default of his trial court error claim raised in his federal habeas petition; prisoner failed to raise his ineffective assistance claim in state court and was barred from returning to state court to do so).

Even if petitioner's claim were not procedurally defaulted, it provides no basis for federal habeas relief. Petitioner's assertion that Michael Allen committed "perjury" is wholly unsubstantiated. The fact that Michael Allen received reward money does not show that Allen's testimony was false, it merely provides a basis to impeach Allen's credibility. The reward money was disclosed to the jury in the prosecutor's direct examination of Michael Allen, (doc. 14, ex. F, p. 54), and was emphasized by defense counsel on cross-examination (*id*., pp. 54-55). It was for the jury to decide whether Michael Allen should be believed. The taking of reward money, in and of itself, does not prove that Allen's testimony was false. Petitioner's allegation that DNA testing will establish that he and Michael Allen are not brothers does not suggest that Michael Allen's testimony was false, because Michael Allen did not testify that the two were biological brothers – he testified that they were "brothers," (doc. 14, ex. F, pp. 51, 52, 53), and more specifically, stepbrothers (*id*.,

p. 54).  Petitioner is not entitled to federal habeas relief on this claim, because it is procedurally defaulted and without merit.

<u>Ground 14</u>   <u>C.S.I Vickers planted false evidence (money bands) on petitioner's personal money</u>

Petitioner's final claim is that he "was prejudiced by the State when Ms. Vickers placed false money bands on petitioner's personal money and used it as evidence from the bank that was robbed."  (Doc. 30, continuation pages 16-17). Petitioner argues that "[i]f it was not for Ms. Vickers' misconduct the outcome of the proceeding would have been different." (*Id*., p. 17).  Respondent asserts a procedural default defense, arguing that petitioner has not presented this claim to the state courts and is now barred by state procedural rules from returning to state court to do so. (Doc. 46, p. 30).   Petitioner responds that he presented this claim to the state courts in his Rule 3.850 proceeding.  (Doc. 52, p. 4).

A.    Exhaustion and Procedural Default

The law concerning exhaustion and procedural default is provided above.

Petitioner raised this claim in his postconviction motion as Ground 13.  (Doc. 50, Ex. L, p. 127).  The Rule 3.850 court applied the firmly established and regularly followed state procedural rule that claims challenging the factual basis and sufficiency of the evidence cannot be raised in a Rule 3.850 motion, especially where a direct appeal was taken.  (Doc. 50, Ex. M, p. 181 (*citing Betts. v. State*, 792 So.2d 589, 590 (Fla. 1st DCA 2001)).  The state appellate court affirmed the lower court's decision.  Petitioner's claim, whether construed as one of false testimony, false evidence, manufactured evidence and evidence tampering, or as one involving *Brady*/*Giglio* violations and prosecutorial misconduct, is procedurally barred from federal habeas review, because petitioner failed to raise the claim(s) on direct appeal

and was procedurally barred from raising them in his postconviction motion. Petitioner has not shown cause for his procedural default or made a colorable showing of actual innocence.

Petitioner argues that "[t]his claim was not in petitioner['s] direct appeal because his counsel was ineffective assistance of counsel." (Doc. 52, p. 4). Petitioner did not raise an ineffective assistance of appellate counsel claim in state court, nor did he raise this particular ineffective assistance of trial counsel claim in his Rule 3.850 motion. Petitioner is precluded from now seeking review of either claim in state court. Petitioner's proposed ineffective assistance claim is procedurally defaulted and cannot be considered as cause for the default of his "false evidence" claim raised here. *See Edwards v. Carpenter, supra*. Petitioner's procedural default bars federal habeas review of this claim.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted). Therefore, the court should deny a certificate of

appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1. That the amended petition for writ of habeas corpus (doc. 30), challenging the convictions and sentences in *State of Florida v. Charles Allen, Jr.* in the Circuit Court for Bay County, Florida, Case Nos. 08-1168, 08-1169 and 08-1170 be DENIED.

2. That the clerk be directed to close the file.

3. That a certificate of appealability be DENIED.

At Pensacola, Florida this 8th day of June, 2012.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).